**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| TRINA THOMAS, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| MARRIOTT INTERNATIONAL, INC., | 5:20-cv-00465 |
| Defendant. | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Trina Thomas, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. Plaintiff alleges that Defendant Marriott International, Inc. subjected Plaintiff to harassment and hostile work environment based on sex, constructive discharge, and retaliation after she engaged in protected activities, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

2.

Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2) because Plaintiff was employed and the events underlying this action occurred in Macon-Bibb County, Georgia, which is located in this judicial district.

## PARTIES

3.

Plaintiff Trina Thomas (hereinafter, "Plaintiff" or "Thomas") is a citizen of the United States and a resident of Georgia.  At all times relevant to this suit, Ms. Thomas was employed with Defendant Marriott International, Inc., primarily at its Courtyard by Marriott Macon, located at 3990 Sheraton Dive, Macon, Bibb County, Georgia 31210.

4.

At all relevant times, Ms. Thomas was considered a covered employee under Title VII of the Civil Rights Act.

5.

Defendant Marriott International, Inc. (hereinafter, "Defendant") is a foreign profit corporation, incorporated under the laws of the State of Delaware.

6.

Defendant's principal office address is 10400 Fernwood Road, Bethesda, Maryland 20817, and Defendant may be served with process through its registered agent, C T Corporation System at 289 South Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

7.

Defendant is a private employer engaged in interstate commerce, with annual revenue in excess of $500,000.  Defendant has more than fifteen employees who have worked for at least twenty calendar weeks in 2018 and proceeding years. Defendant is a covered entity and employer within the meaning of Title VI of the Civil Rights Act.

## STATEMENT OF FACTS

8.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 7, as if the same were set forth herein.

9.

Ms. Thomas was assigned male at birth, but she has identified as female and presented as such at all times at issue in this litigation.

10.

Generally speaking, for people who identify as transgender, information concerning the sex that they were assigned at birth, along with details connected to the process of changing their gender presentation to that which they identify (or "transition"), is extremely sensitive and private information.

11.

Similarly, Ms. Thomas considers information concerning the sex she was assigned at birth and about her transition, extremely sensitive and private information.

12.

Generally speaking, for people who identify as members of the LGBTQ community, having someone disclose their sexual orientation and/or gender identity to third-parties, without that persons' permission, can not only be deeply offensive, but it can give rise to such persons' concern for their privacy and even safety.  This is particularly true for individuals who identify as transgender who are subjected to disproportionate rates of discrimination, harassment, violence, and sexual assault.

13.

Similarly, Ms. Thomas considers having information about her gender identity disclosed to others without her permission deeply offensive. Ms. Thomas feels that being "outed" compromises her privacy and creates an unnecessary risk to her safety.

14.

Ms. Thomas first became employed with Defendant on June 14, 2016 in its Guest Services Department at the Philadelphia City Center Residence Inn.

15.

Defendant passed over Ms. Thomas for several promotions, and it was Ms. Thomas' belief that she was not given such opportunities because of her gender identity.

16.

Moreover, one of Ms. Thomas' coworkers consistently harassed her because she identified as transgender.

17.

As a result of the harassment, and seeing no real opportunity for promotion, Ms. Thomas sought to transfer to one of Defendant's Atlanta-area locations in 2018. Ms. Thomas was unable to find an open position in Metro Atlanta, but saw that there was an opening at Defendant's Courtyard by Marriott Macon location.

18.

Ms. Thomas contacted the Macon hotel and spoke to Front Office Manager John Carpenter. Ms. Thomas provided some information as to why she intended to transfer, and the Front Office Manager said that he expected that Ms. Thomas would have a better opportunity at the hotel because someone in management is gay. Ms. Thomas understood this comment to mean that this

location would be welcoming to all of its LGBTQ employees.

19.

Ms. Thomas decided that she would apply for the open position in Macon as being in an environment where she felt welcome and free from harassment was extremely important to her.

20.

In June 2018, Ms. Thomas was hired to work at the Courtyard by Marriott Macon and her position was to be known as Guest Services Lead.

21.

Defendant decided to create this position for Ms. Thomas based on her exemplary performance in her prior position and so she would receive similar compensation as she had in Philadelphia, a city with a higher cost of living.

22.

Just prior to her departure from Defendant's Philadelphia location, one of Ms. Thomas' coworkers referred to Ms. Thomas using a female pronoun, then seconds later, began calling Ms. Thomas "he." Ms. Thomas corrected the coworker and became visibly upset about the incident and began to cry, but the coworker's only response to Ms. Thomas was laughter.

23.

In an email message to her Philadelphia supervisor, Ms. Thomas tried to express how this type of treatment made her feel. Ms. Thomas went on by expressly requesting that the coworker not be disciplined, but she urged the supervisor to make changes to the culture so that all employees are respected as they wish.

24.

Soon thereafter, Ms. Thomas relocated to Middle Georgia, excited to be starting at a

location where she would be respected and not subjected to harassment based on her gender identity on August 18, 2018.

25.

Ms. Thomas later learned that, prior to her arrival in Macon, several coworkers were told that she was transgender.

26.

According to General Manager Matthew Jennings, he found out that Ms. Thomas identifies as transgender from management in Philadelphia, then immediately told the Operations Manager Wilherming Jackson since Ms. Thomas' preferred name and legal name would not match. General Manager Jennings also claimed that he asked Operations Manager Jackson not to reveal the information, except on a need-to-know basis.

27.

Instead of keeping this information confidential, Operations Manager Jackson disclosed Ms. Thomas' gender identity to all other employees of the hotel.

28.

Notwithstanding the unauthorized disclosures of Ms. Thomas' gender identity before her arrival, Ms. Thomas initially felt like she was in a positive environment and that she was being respected by her coworkers. However, the workplace culture rapidly devolved several weeks later.

29.

As soon as Ms. Thomas began her employment in Macon, she experienced harassment from coworkers, and management often knew of the conduct but failed to take any action.

30.

For example, several of Ms. Thomas' coworkers told her that one employee (hereinafter,

"Brandon") would frequently refer to Ms. Thomas simply as "it."  Brandon also made comments to several others such as, "did you see what they brought up in here?  They brought it."

31.

General Manager Jennings observed Brandon refer to Ms. Thomas as "it," but he failed to take any actions to correct or address the conduct.

32.

Brandon would often refer to Ms. Thomas as "it" both in her presence and in comments made directly to her.

33.

The term "it" is considered a derogatory slur when used toward people who identify as transgender because it is dehumanizing.  It is also a clear attempt by the individual using the word to refuse to respect a person's preferred gender and pronouns.

34.

Indeed, Ms. Thomas felt offended, disrespected, and dehumanized when she heard colleagues refer to her by this term, and especially when the pejorative had been used to refer to her outside of Ms. Thomas' presence.

35.

On another occasion, Brandon referred to Ms. Thomas by her legal name, in what appeared to be intended as a joke.  Ms. Thomas responded to Brandon, explaining that this was offensive, that it was not a joke, and that this conduct should stop.

36.

After this conversation, Brandon would frequently refer to Ms. Thomas by her legal name, outside of her presence, with their coworkers.

37.

Shortly after Ms. Thomas began in Macon, her coworkers found out that Ms. Thomas was in a relationship with an individual (hereinafter, "Miller") who identifies as transgender and presents as male.

38.

After that time, Brandon began making inappropriate and disrespectful comments about Miller.

39.

For example, on one occasion Brandon said to Ms. Thomas, "*Mildred* is not [Ms. Thomas'] boyfriend, she is [Ms. Thomas'] girlfriend because she still has a pussy."

40.

Operations Manager Jackson was present when Brandon made this statement, and she clearly heard the comment but failed to take any remedial action.

41.

Brandon also made numerous comments about Ms. Thomas' genitals, both directly to her and in conversations with third persons.

42.

Brandon and another coworker (hereinafter, "Elise") frequently made disparaging comments about Ms. Thomas in their conversations with one another.

43.

Elise once told Brandon, "look at [Ms. Thomas'] feet … they are too damn big for her to be a woman."

44.

Elise and Brandon also made several statements that "Miller is really a girl trying to be a boy and [Ms. Thomas] is really a boy trying to be a girl."

45.

The aforementioned conduct by Brandon, Elise, and others was objectively offensive.

46.

One of Ms. Thomas' coworkers who has a family member who identifies as transgender and would tell their coworkers how this kind of language was offensive, would get them in trouble with human resources, and was a serious offense when she would overhear Brandon, Elise, and others make disparaging comments about Ms. Thomas.

47.

Despite these warnings, Defendant's employees did not cease the conduct.

48.

There were several other employees who may have not made disparaging comments toward Ms. Thomas, but they would blatantly refuse to speak or interact with Ms. Thomas, even when such conversations were necessary for tasks directly related to their respective job duties.

49.

By the end of October 2018, individuals would make disparaging comments about Ms. Thomas, use terms that are offensive to transgender people, and otherwise disrespect Ms. Thomas nearly every day.

50.

Sometimes this conduct occurred in the presence of guests of the hotel.

51.

On October 25, 2018, Ms. Thomas learned that several employees had gathered that morning discussing Ms. Thomas' "life choices."  As it was described, it sounded less like a discussion and more of a roast of Ms. Thomas, but without her being present.

52.

Assistant General Manager Sonita Segrest (hereinafter, "Assistant GM Segrest") had only been in her position for a three-week period.  She had been told what pronouns Ms. Thomas preferred, yet several times per week, she would refer to Ms. Thomas directly as "he" or "yes, sir."

53.

Both Ms. Thomas and other individuals corrected Assistant GM Segrest several times, but she refused to stop referring to Ms. Thomas using male pronouns.

54.

On October 25, 2018, Assistant GM Segrest issued a Coaching & Counseling form to Ms. Thomas for a relatively minor mistake in which Ms. Thomas accidentally checked in one guest under the name and reservation of a different individual.  Critically, both guests' first names began with the same letter, and they both shared the same last name.

55.

On the disciplinary form, Assistant GM Segrest referred to Ms. Thomas using her legal name, despite knowing that it was not the name that Ms. Thomas preferred.

56.

Additionally, Assistant GM Segrest made reference to Ms. Thomas on the form using both the pronouns "he" and "she," despite knowing how Ms. Thomas identified.

57.

Ms. Thomas was offended by the way she had been referenced in the write up, but she was particularly angry by Assistant GM Segrest's use of both female and male pronouns in the same document.

58.

Ms. Thomas felt the need to report the harassment, despite the fact that her supervisors often observed the conduct at issue.

59.

Apparently around the same time, management said something to Elise about Ms. Thomas' complaints about her, but failed to take any additional remedial actions.  Immediately after Ms. Thomas' complaint, Elise began to completely ignore Ms. Thomas, despite the fact that they worked in the same area and close proximity.  Elise would ignore and disrespect Ms. Thomas in the presence of guests.

60.

Several days after the October 25, 2018 incidents, Ms. Thomas provided her supervisors with a written complaint, citing Defendant's Equal Employment Opportunity policy, and describing how she felt about the harassment.

61.

On or before November 1, 2018, Ms. Thomas made initial contact with the Equal Employment Opportunity Commission, describing the harassment and hostile work environment.

62.

It was around this time that Defendant began reducing the hours in which Ms. Thomas was scheduled.

63.

Ms. Thomas' supervisors failed to take any action on her complaint and the hostile work environment and disparaging remarks continued on a daily basis for the month of November 2018.

64.

Ms. Thomas found that each day was difficult and was having a profound impact to herself, as well as her home life and relationships.

65.

Toward the beginning of November 2018, Ms. Thomas wanted to continue working for Defendant, but she no longer felt safe or comfortable a Defendant's Macon location. She was hoping to stay with Defendant's brand but transfer to a property in another city. Ms. Thomas also began looking to see if she could find a job with Defendant, in whiche she could support Defendant's LGBTQ employees and ensure that others did not share her experience.

66.

Ms. Thomas' supervisors failed to follow up with her about her complaints for the entire month of November.

67.

On December 2, 2018, General Manager Jennings asked to speak with Ms. Thomas outside. Ms. Thomas explained that the harassment had not only continued, but that the individuals whom she named in her complaint had become increasing hostile and were interfering with her work.

68.

In response, General Manager Jennings told Ms. Thomas that he could not make anyone accept her and that she would "just have to deal with it."

69.

Ms. Thomas told General Manager Jennings that she would resign before she put up with the harassment, and she submitted her resignation on the same day.

70.

Ms. Thomas continued to work for Defendant until December 14, 2018.

71.

From her resignation until January 8, 2019, Ms. Thomas submitted approximately 15 applications for open positions at Defendant's other properties. All of her applications were denied.

72.

Defendant has a portal in which employees are able to search for open positions and submit their applications. When an employee resigns, it is Defendant's policy or practice to keep the employee's username active for 90 days after their resignation.

73.

By January 8, 2019, merely 37 days after she submitted her resignation, she found that Defendant had removed her from their system.

Procedural/Administrative Background

74.

Prior to November 1, 2018, Ms. Thomas made initial contact with the Equal Employment Opportunity Commission (hereinafter, "EEOC"), and she was assigned a Charge Number.

75.

On February 7, 2019, Ms. Thomas signed and returned her EEOC Form 5 Charge of Discrimination, which had been prepared by a representative of the EEOC. (EEOC Charge No. 410-2018-06989).

76.

On multiple occasions, Ms. Thomas informed the EEOC Investigator assigned to her case that she was represented by counsel, but the EEOC continued to communicate with Ms. Thomas directly and never contacted counsel.

77.

According to the EEOC's Online System to Check the Status of a Charge, a Dismissal and Notice of Rights was issued on September 11, 2020. However, the EEOC never sent any information or correspondence to counsel, and Ms. Thomas has changed her mailing address since her Charge was filed, meaning that neither Ms. Thomas nor counsel have received the Dismissal and Notice of Rights.

78.

Ms. Thomas has exhausted her administrative remedies and she is filing the instant litigation within 90 days of when the EEOC reports that it issued her the right to sue.

**COUNT I:**
**HOSTILE WORK ENVIRONMENT DUE TO SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

79.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 78, as if the same were set forth herein.

80.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against or harass any of its employees on the basis of sex. *See* 42 U.S.C. § 2000e-2(a).

81.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because they are transgender. *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020); *see also Chavez v. Credit Nation Auto Sales, LLC*, 641 Fed. App'x 883, 884 (11th Cir. 2016) (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011)).

82.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

83.

Plaintiff is a member of a protected class in that she is female and identifies as transgender.

84.

Defendant, through one of Plaintiff's supervisors, subjected Plaintiff to a hostile work environment by intentionally outing Plaintiff, or disclosing and discussing Plaintiff's gender identity without Plaintiff's permission, to all of Plaintiff's coworkers prior to Plaintiff's arrival, and in clear contravention of Plaintiff's request that the information remain private, as well as Defendant's policies regarding confidentiality.

85.

Defendant, through several of Plaintiff's coworkers and supervisors, subjected Plaintiff to a hostile work environment by intentionally and frequently misgendering Plaintiff as male, despite

knowing that Plaintiff identifies as female. Plaintiff's supervisors were aware of her coworker's conduct, but failed to take any measures to stop or remedy the harassment.

86.

Defendant, through several of Plaintiff's coworkers, subjected Plaintiff to a hostile work environment by making comments to other employees in the presence of Plaintiff that were intended to make Plaintiff feel as though she were not female. Plaintiff's supervisors were aware of this harassment but failed to take any measures to stop or remedy the harassment.

87.

Defendant, through several of Plaintiff's coworkers, intentionally subjected Plaintiff to a hostile work environment by referring to Plaintiff by pejorative and derogatory slurs, intentionally using a name to refer to Plaintiff that was known to be offensive, making disparaging comments about Plaintiff's genitalia, making jokes that Plaintiff was not a real woman, making disparaging comments about Plaintiff and her significant other solely because of their gender identities, and ignoring and refusing to speak to Plaintiff even when such interaction was necessary to perform job duties. Plaintiff's supervisors responsible for some this conduct Plaintiff's supervisors were aware of Plaintiff's coworker's conduct, but failed to take any measures to stop or remedy the harassment.

88.

Plaintiff found the aforementioned conduct unwelcome and extremely offensive.

89.

All of the aforementioned conduct was directed to Plaintiff because of her sex, gender identity, and identification as a transgender person.

90.

The aforementioned conduct would not have occurred but for Plaintiff's sex, gender identity, and her identification as a transgender person.

91.

Defendant's employees who identify as a different sex or gender identity than Plaintiff or identify and present as cisgender (i.e., not transgender) were treated better than Plaintiff and not subjected to similar treatment as described herein.

92.

Plaintiff was subjected to the aforementioned conduct on a regular and daily basis, beginning even before Plaintiff started her employment.  Many of Plaintiff's coworkers were responsible for the harassment, as well multiple supervisors.  As a result, the harassment that Plaintiff experienced was pervasive.

93.

Any reasonable person who identifies as a member of the LGBTQ community who, like Plaintiff, had a supervisor disclose their sexual orientation or gender identity to all of their coworkers, without permission, would find such conduct hostile and abusive.

94.

Any reasonable person who, like Plaintiff, had their coworkers and supervisors intentionally refuse to refer to such person as the gender of which they identify would find such conduct hostile and abusive.

95.

Any reasonable person who, like Plaintiff, had coworkers make comments to other coworkers that were intended to make such person feel as though they did not truly meet the

requirements of the gender of which such person identifies would find such conduct hostile and abusive.

96.

Any reasonable person who identifies as transgender who, like Plaintiff, had a coworker make a series of offensive, vulgar, and profane comments to Plaintiff regarding her genitalia would find such conduct hostile and abusive.

97.

Any reasonable person, particularly a person who identifies as a member of the LGBT community, who, like Plaintiff, had coworkers regularly make disparaging comments about their gender identity and that of their partner and refer to such person as a "it" would find such conduct hostile and abusive.

98.

Any reasonable person, particularly one who identifies as transgender, who, like Plaintiff, had a supervisor refer to such person in a written warning as male, female, and a name of which the person did not identify would find such conduct hostile and abusive.

99.

As a result, the aforementioned conduct that Plaintiff experienced while employed with Defendant, taken either alone or all together, was sufficiently severe and pervasive enough to alter the terms of Plaintiff's employment with Defendant.

100.

Any reasonable person would know that the aforementioned conduct, taken either alone or all together, was not only completely inappropriate for the workplace, but anywhere. As a result, the harassment that Plaintiff experienced while working for Defendant was severe.

101.

Any reasonable person, particularly one who identifies as transgender or is otherwise aware of the disproportionate rates of violence, rape, and sexual assault experienced by people who identify as transgender, would have considered the aforementioned conduct, particularly with Defendant's unauthorized disclosure of Plaintiff's gender identity to all of her coworkers, would find such conduct threatening to their physical safety and wellbeing.

102.

The aforementioned conduct made it difficult for Plaintiff to perform her duties and even go to work because of the feelings of anxiety, humiliation, and fear for her safety. As a result, the aforementioned conduct unreasonably interfered with Plaintiff's job performance.

103.

Plaintiff was subjected to the aforementioned conduct beginning before she started her employment and it continued each day of her employment. As a result, Plaintff's workplace was permeated with this discriminatory intimidation, ridicule, and insult.

104.

Plaintiff's supervisors were aware of the harassment, of which Plaintiff's coworkers and supervisors were responsible, but the supervisors failed to address or correct the conduct, or provide Plaintiff with the opportunity to engage in any preventative or corrective measures.

105.

Moreover, Plaintiff's supervisors were responsible for some of the aforementioned conduct.

106.

Accordingly, Defendant subjected Plaintiff to harassment and hostile work environment in violation of Title VII of the Civil Rights Act.

107.

Defendant is liable for both the conduct of its non-supervisory employees and its supervisors.

108.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned offensive conduct.

109.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages at the statutory limit, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

110.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 78, as if the same were set forth herein.

111.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees because an employee has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).

112.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively, *See* 42 U.S.C. §§ 2000e & 2000e-1.

113.

As alleged herein, Plaintiff opposed the discriminatory practices, reported the harassment to her supervisors, and contacted the EEOC and later caused a Charge of Discrimination to be filed.

114.

An employee, like Plaintiff, who complains about the type of harassment alleged, reports the harassment to supervisors, and/or make contact with the EEOC or files a charge of discrimination is opposing a practice made unlawful by Title VII of the Civil Rights Act and is, therefore, engaged in a protected activity.

115.

After Plaintiff's coworkers became aware of Plaintiff's complaints to management about the coworker's conduct, they continued and increased their harassment of Plaintiff.

116.

After management became aware of Plaintiff's protected activities, they reduced the hours that she was scheduled to work.

117.

After Defendant became aware of Plaintiff's protected activities, Defendant caused her to be unable to secure a position in another location with Defendant and removed Plaintiff from Defendant's online before the standard amount of time had lapsed.

118.

Defendant's conduct, as alleged, herein constitutes retaliation in violation of Title VII of the Civil Rights Act.

119.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the aforementioned retaliatory conduct.

120.

Plaintiff has been injured by Defendant's retaliation of her, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages at the statutory limit, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT III:**
**CONSTRUCTIVE DISCHARGE**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

121.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 78, as if the same were set forth herein.

122.

A claim for constructive discharge "is appropriate when an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1258 (11th Cir. 2017).

123.

For the reasons set forth in Count I, *supra*, which are incorporated herein, Defendant subjected Plaintiff to harassment and hostile work environment based on her sex and gender identity and because she identifies as transgender.

124.

Any reasonable person in Plaintiff's position, who experienced the harassment and hostile work environment alleged herein, would feel that her working conditions were so intolerable that she would be compelled to resign.

125.

Plaintiff took all reasonable measures to prevent the harassment, report the conduct to her supervisors, and attempt to improve her work environment.

126.

Plaintiff's supervisors not only failed to address the harassment, but Plaintiff was ultimately told on December 2, 2018, that she simply have to "deal" with the treatment.

127.

As a result, Defendant had made Plaintiff's working conditions so intolerable that Plaintiff felt compelled to submit her resignation on or about December 2, 2018.

128.

As a result, Plaintiff's working conditions had become so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign, from both a subjective and objective standard.

129.

Defendant's conduct as alleged herein constitutes constructive discharge based on sex in violation of Title VII.

130.

Plaintiff will prove that Defendant's stated reasons for its conduct were not the true reasons, but, instead, were pretext to hide Defendant's discriminatory and retaliatory animus.

131.

Plaintiff has been injured by Defendant's constructive discharge, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages at the statutory limit, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Trina Thomas respectfully prays for the following relief:

1)    That Summons and Process be issued to Defendant Marriott International, Inc., and that said Defendant be served as provided by law;

2)    That this matter be tried before a jury;

3)    That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for subjecting Plaintiff to harassment and a hostile work environment, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)    That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for Defendant's retaliation against Plaintiff, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

5)    That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for Defendant's constructive discharge of Plaintiff, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

6)    For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 10th day of December, 2020.

KENNETH E. BARTON III
Georgia Bar No. 301171
MISHAEL K. NAJM
Georgia Bar No. 747961
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mkn@cooperbarton.com